**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JOSE DELGADO,

                              Plaintiff,

            v.                                              No. 13-CV-728
                                                              (DNH/CFH)

POTTER,

                              Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

JOSE DELGADO
Plaintiff Pro se
12-A-0864
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, New York 14411


HON. ERIC T. SCHNEIDERMAN          GREGORY RODRIGUEZ, ESQ.
Attorney General for the                      Assistant Attorney General
   State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

      Plaintiff <u>pro se</u> Jose Delgado, an inmate currently in the custody of the New York State

Department of Correctional and Community Supervision ("DOCCS"), brings this action

pursuant to 42 U.S.C. § 1983 alleging that defendant Rowland Potter, who, at all relevant

_____

      [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

times, was a Corrections Officer at Greene Correctional Facility ("Greene"), violated his rights under the First and Fourteenth Amendments of the Constitution of the United States. On July 18, 2014, defendant moved for summary judgment. Dkt. No. 22. Delgado did not oppose that motion. For the reasons outlined below, defendant's motion should be denied in part and granted in part.

## I. **Failure to Respond**

The Court notified Delgado of the response deadline. Dkt. No. 24. Despite this notice, Delgado did not respond to the motion for summary judgment.

"[S]ummary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically." Id. at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56 (c). "A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (internal citations omitted); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (same). The facts set forth in defendants' Rule 7.1 Statements of Material Facts (Dkt. No. 39-2; Dkt. No. 41-3) are accepted as true as to those facts that are not disputed in Delgado's complaint. N.D.N.Y.L.R. 7.1 (a) (3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. **Background**

### A. **Delgado's Version of Events**

The facts are reviewed in the light most favorable to Delgado as the non-moving party. See subsection III(A) infra. At all relevant times, Delgado was an inmate at Greene. Delgado resided in E-2 dorm, a large open room with approximately sixty beds. Dkt. No. 22-1 (transcript), at 8.[2] Delgado was assigned to a double bunk that he shared with another inmate. Id. Delgado had access to two personal storage lockers near his bunk: a large locker that was approximately four feet tall, and a smaller locker that was approximately two feet tall. Id. at 8-10. Within the lockers, Delgado stored items such as clothing, both personal and state-issued; pictures; food; and toiletries. Id.

On June 3, 2013, Delgado filed an inmate claim form, requesting reimbursement of $8.99 for a book or magazine. Dkt. No. 22-3, at 8-10. Burns had ordered five books or magazines, and, although all five were sent to the facility, only four of them were delivered to him. Id. He placed his claim in a locked mailbox in the E-2 dorm. Id. at 78. Corrections Officer Snide investigated this claim, assigned as Inmate Claim number 670-0033-13, and approved the reimbursement on June 14, 2013. Dkt. No. 22-3, at 5, 7, 11-12.

Delgado alleges that on June 18, 2013, defendant was assigned as the "steady of the house" for the E-2 dorm,[3] meaning that he worked the 7:00 a.m. to 3:00 p.m. shift in the E-2

---

[2] The page numbers referenced in Dkt. 22-1, the deposition transcript, refer to the pagination of the header numbers generated by CM/ECF, not the individual transcript itself.

[3] As noted below, defendant contends that he was not working on June 18, 2013. Dkt. No. 22-6, at 2. Defendant also states that, in June 2013, his shift was at M-Rec Rovers, not E-2 dorm.

3

dorm.  Compl. at 4; Dkt. No. 22-1, at 12-14.  There is only one officer supervising the E-2

dorm at a time.  Id. at 14.  Delgado contends that, at about 7:00 a.m., defendant came up to

him and said, "filing claims regarding property is bull shit, file a claim on this!"  Compl. (Dkt.

No. 1), at 4.  He then proceeded to either pick up or push over Delgado's large locker.  Id.

at 5.  This destroyed or damaged Delgado's lotions, creams, clothing, pictures, and food

items.  Id.; Dkt. No. 22-1, at 20, 56.

Delgado contends that on two occasions prior to the June 18 incident, defendant had

pushed over his locker.  Dkt. No. 22-1, at 17.  This resulted in the destruction of Delgado's

clothing and pictures.  Id. at 20.  Delgado did not grieve these incidents "because at the

time it [sic] wasn't no [sic] reason to file no [sic] grievance.  Because if you file a grievance,

they'll pull you down to the sergeant's office and basically try to have you sign off to the

grievance or all types of stuff."  Id. at 19.  Defendant would push over inmates' lockers if

their personal items were "not in compliance," such as if a cup were on top of the locker.  Id.

at 16-18.  Delgado contends that there was no facility rule prohibiting inmates from keeping

cups or other items on top of the lockers.  Id. at 18.  Defendant would push over the lockers

of both bunkmates if one bunkmate's property was disorderly.  Id.  Delgado never filed a

grievance about defendant pushing over his locker on those two occasions.  Id. at 18-19.

Delgado felt that there was "no reason" to grieve those incidents because "they'll call you

down to the sergeant's office basically threaten you, like, yo, listen, if you don't sign off to

this, this will happen or that would happen or, you know?"  Id. at 19.  Delgado knew what

happened when inmates filed grievances at Greene because other inmates would speak

about it.  Id. at 20.

In his deposition, Delgado stated that defendant did not individually warn him of the

4

consequences of filing a grievance, but instead made statements to the entire dorm about grievances. Dkt. No 22-1, at 23-24. On more than one occasion, defendant announced to the dorm that, if they filed grievances, "this is what's going to happen and if y'all [sic] willing to choose to do that, then do it, but these are the consequences, the repercussions of doing it." Id. at 24-25. Defendant indicated that the consequences could include "finding weapons in the cube or out of nowhere . . . whatever to make it harder on y'all [sic] . . . . [B]asically stating that if you fuck with him, this is what's going to happen. Id. at 25-26. Defendant "didn't have to verbally state that he was going to come and do anything to any of us, because we knew what was going on and what – what we was [sic] seeing, so that's why a lot of people wasn't [sic] notifying anybody." Id. at 34. As a result of the threats made to the dorm, many inmates did not file grievances against him. Dkt. No. 22-1, at 25-26. Delgado does not know of an inmate who was beaten up or who had a false misbehavior report submitted against him after filing a grievance. Id. at 31. However, for those inmates that have filed actions in court, the consequence Delgado has seen is that ""they'll get [the grievants] out of the jail or they'll basically put it like if they was [sic] fighting, if they had a fight or something on the walkway and they'll get [them] out there." Id. at 32.[4]

On June 18 at around 7:00 a.m., Delgado awoke to defendant "slamm[ing]" his "stuff" and knocking over his locker. Dkt. No. 22-1, at 44-45. When Delgado asked defendant what the problem was, defendant told him, "because of what was going on with [his] bunky, what had – what [his] bunky had on his locker." Id. at 36, 44-45. Delgado also stated in his deposition that he asked defendant, "why are you flipping my property over," and defendant

---

[4] In using the term "they," is unclear whether Delgado is referring to defendant or DOCCS.

did not respond; instead, he "just kept on moving on me . . . . and continued looking who – who [sic] other locker he could flip over." Id. Before flipping over Delgado's locker that morning, defendant flipped over one other locker. Id. at 48-49.

While being deposed, Delgado was asked why his testimony about what defendant said to him differed from the claims he made in his complaint. Dkt. No. 22-1, at 46. Thereafter, Delgado claimed that defendant "asked about the claim thing" after flipping over his locker. Id. He stated that defendant "basically told me . . . why are you filing a claim, why are you filing a claim[?] Didn't like let you know, but if you want to file a claim, file a claim about this, basically destroyed my property." Id. Delgado contends that defendant did not directly threaten him against filing a grievance at that time because "he was already under investigation from other inmates from the Inspector General . . . . He had no choice but to fall back because he had a whole bunch of other inmates having their family call up to say what he was doing." Id. at 50-51. By contrast, in his complaint, Delgado contended that defendant threatened him that he would be beaten up or set up with a misbehavior report if he filed a grievance. Compl. at 3. Delgado was unaware how defendant would have known about his property claim. Dkt. No. 22-1, at 65.

Delgado did not file a grievance about the June 18 locker incident. Dkt. No. 22-1, at 43. Delgado stated in his complaint that he did not grieve the incident because defendant told him that he would "get set up with a false misbehavior report or beaten up!" Compl. at 3. In his deposition, Delgado explained that did not file a grievance because "it wouldn't not [sic] got anywhere, as in like that because then they would have just threatened me to sign off." Dkt. No. 22-1, at 23. As a result of defendant flipping over his locker on June 18, Delgado's personal clothing was stained, his personal food items crushed, his oils and lotions spilled,

and his pictures damaged.  Id. at 55-64.  Delgado believes that defendant retaliated against him by intentionally pushing over his locker because he filed a claim for the lost magazine. Id. at 64.

Delgado contends that the day after the June 18 incident, he submitted his complaint in order to commence this action.  Dkt. No. 22-1, at 52-54.  He alleges that he also wrote to "the Corrections and the Inspector General" about the incident and contended that he had copies of these letters.  Id. at 54.[5]  Delgado was transferred out of this dorm in October 2013 and sent to SHU in Cayuga Correctional Facility after getting into an altercation with another inmate.  Dkt. No. 22-1, at 78-79.  After spending four months in SHU, he was returned to Greene and placed in the E-1 dorm.  Id. at 79.

## B.  **Defendant's Version of Events**

Defendant contends that he was not working at Greene on June 18, 2013.  Dkt. No. 22-6, at 2.  In June 2013, defendant was assigned to the 3:00 p.m. to 11:00 p.m. shift in M-Rec Rovers, a post on the north side of Greene which covers the L and M dorms.  Id.  M-Rec Rovers do not cover the E-2 dorm, where Delgado was housed.  Id.  On June 19, 2013, defendant worked a shift for Officer Parker, the regular bid officer assigned to the E-2 dorm. Id.  This was a 7:00 a.m. to 3:00 p.m. shift.  Part of defendant's duties while covering the E-2 dorm that day was to conduct "daily cube and locker searches."  Id.  Pursuant to DOCCS's policy, a certain number of randomly-selected inmates in each housing unit are subject to cell and locker searches each day.  Id.  There may also be unscheduled living

---

[5]  Delgado did not provide copies of these letters or otherwise offer additional detail about the content of these letters or whether he received a response.

quarter searches if "there is reasonable suspicion that contraband is contained in the housing unit." Id. at 3.  Such unscheduled searches are to be authorized by a supervisor unless "there are reasonable grounds to believe that a search is immediately necessary to prevent death, injury, or the destruction of contraband."  Id.  In such a situation, the employee "may conduct the search and then submit a written report to his or her supervisor explaining the urgency of the search and its results."  Id.

Defendant contends that Delgado was not on the random cell search list nor was there an unscheduled search of his locker on June 19, 2013.  Dkt. No. 22-6, at 3.  Defendant denies making threats to the dorm or to Delgado for filing grievances or claims.  Id.  Defendant also denies picking up or flipping over Delgado's locker.  Id.  Further, defendant denies knowledge of inmate claim number 670-0033-13.  Id.  Defendant states that inmate claims for the E-2 dorm are placed by inmates in the mail lockbox in that dorm.  Id. at 4.  Defendant does not have a key to that lockbox and mail was not collected during his 7:00 am to 3:00 p.m. shift in E-2 dorm on June 19.  Id.

## III.  Discussion[6]

Delgado contends that defendant violated his constitutional rights under the First and Fourteenth Amendments of the Constitution of the United States.  Specifically, he alleges that (1) defendant retaliated against him for the protected First Amendment conduct of filing an inmate property claim and (2) he was denied Equal Protection under the Fourteenth Amendment because he was treated differently from inmates who had not filed property

---

[6]  All unpublished decisions cited to within this Report-Recommendation are attached hereto.

claims.[7]

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v.

---

[7] Insofar as Delgado's complaint may be read as raising a claim for lost property, the Fourteenth Amendment does not afford the prisoner a remedy. Daniels v. Williams, 474 U.S. 327, 335 (1986). Further, it is well-settled that even where deprivation is intentional, there is no remedy available in federal court if there exists an adequate state court remedy. See Hudson v. Palmer, 468 U.S. 517, 533 (1984). As "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action pursuant to N.Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4)[,]" there is no remedy in federal court for Delgado's property damage. Davis v. New York, 311 Fed. Appx. 397, 400 (2d Cir. 2009) (citation omitted).

<u>Prudential Residential Servs., Ltd. Partnership</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994);

<u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a <u>pro se</u> litigant, a court must afford

the non-movant special solicitude.  <u>See</u> <u>Triestman v. Federal Bureau of Prisons</u>, 470 F.3d

471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is
> entitled to "special solicitude," . . . that a pro se litigant's submissions must
> be construed "liberally,". . . and that such submissions must be read to
> raise the strongest arguments that they "suggest," . . . . At the same time,
> our cases have also indicated that we cannot read into pro se submissions
> claims that are not "consistent" with the pro se litigant's allegations, . . . or
> arguments that the submissions themselves do not "suggest," . . . that we
> should not "excuse frivolous or vexatious filings by pro se litigants," . . . and
> that pro se status "does not exempt a party from compliance with relevant
> rules of procedural and substantive law . . . .

<u>Id.</u> (citations and footnote omitted); <u>see</u> <u>also</u> <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d

185, 191-92 (2d Cir. 2008).


## B. Exhaustion

Defendant contends that Delgado failed to exhaust his administrative remedies

because he did not file a grievance relating to the locker incident.  Dkt. No. 22-7, at 3-7.

Delgado concedes that he failed to exhaust his administrative remedies, but contends that

defendant should be estopped from arguing the exhaustion defense because defendant

threatened that, if Delgado filed a grievance, he would "make sure that [he] w[ould] get set

up with a false misbehavior report or beaten up."  Compl. at 3.  Deglado testified that, on

multiple occasions, defendant made sweeping threats in the form of announcements to all

of the inmates in his dorm about the consequences of complaining or filing grievances.  Dkt.

No. 22-1, at 31-32.

Under 42 U.S.C. § 1997e(a), the Prison Litigation Reform Act, an inmate must exhaust all administrative remedies before bringing an action for claims relating to his incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted). The exhaustion requirement applies even if the administrative grievance process does not provide for all of the relief requested by the inmate. Nussle, 534 U.S. at 524.

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)). Thus, even where an inmate has failed to exhaust, a court must conduct a three-part inquiry to determine whether an inmate's failure to follow the applicable grievance procedures is excusable. In making this inquiry, a court must consider whether:

> (1) administrative remedies are not available to the prisoner;
> (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the action complained of." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). The test to determine the availability of an

11

administrative remedy is an objective one, whether "a similarly situated individual of ordinary firmness" would have deemed it accessible.  Id. at 688.  Estoppel may render administrative remedies unavailable when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible.  An inmate could glean this understanding from prison officials' threats, beatings, or denials of grievance forms, or by other misconduct deterring him from fulfilling the requisite procedure." Kasiem v. Switz, 756 F.Supp.2d 570 (S.D.N.Y. 2010) (internal citations and quotation marks omitted); see also Macias v. Zenk, 495 F.3d 37, 45 (2d Cir. 2007).  However, "mere allegation[s] of a generalized fear of retaliation [are] insufficient" to excuse a failure to file a grievance.  Brown v. Napoli, 687 F.Supp.2d 295, 297 (W.D.N.Y.2009) (collecting cases).

At all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. Comp. Codes. R. & Regs. tit. 7, § 701.5 (2014).  First, the inmate is required to file a complaint with an inmate grievance program clerk ("IGP") within twenty-one days of the alleged action.  Id. at § 701.5 (a) (1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. at § 701.5 (b)(1).  If no informal resolution occurs, the full IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after conclusion of the hearing.  Id. §§ 701.5 (b)(2)(i), (ii).  If unfavorable, a grievant may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. §701.5 (c) (1).  If the superintendent's determination is unfavorable, the grievant may take the third and final step of the grievance procedure by appealing to the central office review committee ("CORC") within seven days after receipt of the unfavorable Superintendent's determination.  Id. §§ 701.5 (d)(i),(ii).  CORC must issue a written decision within thirty days

12

of receipt of the grievant's appeal.  Id. § 701.5 (d)(2)(ii).

As a preliminary issue, there are several factual inconsistencies between Delgado's version of events and defendant's recollection, as well between Delgado's complaint and deposition testimony.  These inconsistencies include the date of the incident; defendant's regular assigned post at Greene; whether defendant told Delgado the reason for knocking over his locker; and whether defendant individually threatened Delgado against filing a grievance, rather than threatening the dorm collectively.  Dkt. No. 22-1, at 23, 33.  Although Delgado's complaint conflicts with some of his deposition testimony, and his deposition testimony itself is contradictory, Delgado ultimately alleged in both instances (Compl. at 3; Dkt. No. 22-1, at 25-26, 33-34, 45-46) that defendant threatened that filing grievances against him would result in negative consequences – being beaten or set up with false misbehavior reports.  cf. Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005) (granting summary judgment where the plaintiff's testimony was "largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.").  Moreover, such contradictions between the complaint and deposition testimony are credibility issues not appropriately disposed of on summary judgment.  See, e.g., Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").  Thus, inconsistencies will not lead the undersigned to grant defendant's motion for summary judgment.

Inconsistencies aside, Delgado's complaint alleges more than "allegations of a generalized fear of retaliation."  Napoli, 687 F.Supp.2d at 297.  Instead, Delgado argues

that defendant specifically threatened him regarding the grievance procedure – he would be beaten up or set up with false misbehavior reports should he file a grievance. Compl. at 3, 5. Taking these allegations as true, as is required at this level, a similarly-situated person of ordinary firmness would not have considered the administrative remedies available to him.[8]

Accordingly, as there are at least questions of fact regarding whether administrative remedies were available, it is recommended that defendant's motion for summary judgment, insofar as he advances the affirmative defense of non-exhaustion, should be denied.

### C. First Amendment Retaliation

Delgado believes that defendant retaliated against him in violation of the First Amendment by destroying or damaging his property because "[he] put in a claim for something petty, so now – now [he] should put in a claim for basically destroying all my property now." Dkt. No. 22-1, at 64. Delgado also alleges that defendant retaliated against him by threatening to beat him up or set him up with a false misbehavior report should he file a grievance. Compl. at 3.

To state a prima facie retaliation claim under section 1983, a plaintiff must set forth

---

[8] Insofar as Delgado's submissions may suggest that any other DOCCS employee may have prevented him from exhausting his administrative remedies, such a claim must fail as there are no other named defendants. Compl. at 4, 7 ("It is a fact that filing grievances or inmate claims at this facility will get inmates beaten or set up with unfounded misbehavior reports."); ("[T]his facility just beat [sic] inmates up for small reasons."); See, e.g., Murray v. Palmer, 03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *5 (N.D.N.Y. Mar. 31, 2010) ("Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.").

non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, the protected conduct was a "substantial or motivating factor" behind action taken against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007).

Whether the defendant's conduct amounts to adverse action is a contextual inquiry. Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). An action will be considered adverse only if it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . [o]therwise, the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001) overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (internal citations omitted); Vegas v. Artus, 610 F.Supp.2d 185, 208 (N.D.N.Y. 2009).

To satisfy the third element, causal connection, the plaintiff must present evidence demonstrating that the protected speech played a "substantial part in the adverse action." Davis, 320 F.3d at 354. Such evidence may include circumstantial and direct evidence such as, (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendant's statement as to his or her motive for the discipline. See Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995).[9] However, even if the plaintiff

---

[9] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine

demonstrates that an improper motive played a substantial part in the adverse action, a defendant "may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing Doyle, 429 U.S. at 287).  Due to the relative ease with which retaliation can be alleged, courts must review inmates' First Amendment retaliation claims "with skepticism and particular care."  Dawes, 239 F.3d at 49 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)).


### 1. **Property Destruction**

Here, the alleged adverse action is the intentional and retaliatory destruction of personal property.  Under the first prong of the analysis, it appears that filing a claim requesting reimbursement for lost or missing property is a protected action.  Although Delgado did not use the facility's grievance procedure to request the reimbursement, he used the system authorized by the facility for property claims.  See generally Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004)).  As his inmate claim request appears comparable to a grievance in that it is a means of petitioning the government for redress, it constitutes protected conduct sufficient to satisfy the first prong.  See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) (citation omitted).

---

personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

In determining whether certain conduct amounts to an adverse action under the second prong, courts in this Circuit have held that unauthorized, intentional destruction or damage of personal property may serve as a sufficient basis for a First Amendment retaliation claim. Jones v. Harris, 665 F.Supp.2d 384, 399 (S.D.N.Y. 2009) (citing Soto v. Iacavino, 01-CV-5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (additional citation omitted) . Delgado contends that defendant intentionally destroyed or damaged his personal property as retaliation for his filing an inmate complaint. Compl. at 4-6, 9. As intentional retaliatory property damage can chill an individual's constitutional rights (Smith v. City of New York, No. 03 Civ. 7576(NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005), Delgado's claims are sufficient to state an adverse action.

Finally, under the third prong, Delgado provides that defendant destroyed his property two weeks after he filed his inmate claim and four days after the claim was approved. Dkt. No. 22-3, at 5-7. Further, Delgado alleges that defendant referenced the property claim as he knocked over his locker. Dkt. No. 22-1, at 46; Compl. at 4. Thus, the temporal proximity and defendant's alleged statement together demonstrate at least a question of fact suggesting a causal connection between the protected activity and adverse action. Colon, 58 F.3d at 872-73.


### 2. **Threats**

Insofar as Delgado's complaint alleges that defendant threatened to beat him up or issue a false misbehavior report, given the present procedural posture of this case, it appears that these threats sufficiently allege a potential adverse action when considered in

the context Delgado provides.[10]  <u>See</u> <u>generally</u> <u>Barnes v. Alves</u>, 01-CV-6559, 2014 WL

5841123, at *20-21 (W.D.N.Y.  Nov. 10, 2014).  Although "non-specific verbal threats,

harassing comments and hostile behavior do not constitute adverse action sufficient to

state a relation claim," (<u>Ross v. Weschester</u>, No. 10-CV-3937, 2012 WL 86467, at *7

(S.D.N.Y. Jan 11, 2010)), if a complaint is specific enough, given the context of the

allegations, it may suffice to amount to an adverse action.  <u>Ford v. Palmer</u>, 539 Fed. Appx.

6, at *7 (2d Cir. 2013); <u>Hill v. Laird</u>, 06-CV-126 JS/ARL, 2014 WL 1315226, at *8 (E.D.N.Y.

Mar. 31, 2014); <u>cf.</u> <u>Mateo v. Fischer</u>, 682 F.Supp.2d 423, 434 (S.D.N.Y. 2010) (holding that

"opacity" of the defendant's threats against the plaintiff, such as "wait till he puts his hands

on me" and "one day he and I will party" were not direct and specific enough to amount to

adverse actions).   The fact that a threat was not carried out, although "not necessarily

dispositive . . . is a factor weighing against a finding of an adverse action."  <u>Alicea v. Howell</u>,

387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (citation omitted).

　　As noted, Delgado alleges in his *deposition* that defendant did not threaten him with

physical harm or a false misbehavior report when he knocked over the locker on June 18.

Dkt. No. 22-1, at 50-51.  However, liberally construing the *complaint*, Delgado appears to

allege that, after flipping over his locker on June 18, defendant did directly threaten to beat

him up or set him up with false misbehavior reports should he file a grievance.  Compl. at 3.

As articulated in the complaint, the threats were specific and pointed, rather than vague or

---

[10]  To the extent that Delgado's complaint may also be read to allege that the
threats made to the whole dorm prior to June 18, 2013 also constituted an adverse action,
such claim must fail because Delgado did not take any protected action before the June
18 locker incident; thus, any threatening statements made before that date could not be
said to have been in retaliation for protected conduct.

veiled; thus, they suffice to amount to an adverse action as they could have deterred a similarly-situated individual of ordinary firmness from exercising his or her constitutional rights. <u>Dawes</u>, 239 F.3d at 493. Construing the facts in the light most favorable to Delgado as the nonmoving party, the threats to physically harm or set up Delgado with a false misbehavior report are sufficiently specific to amount to an adverse action.

Under the final prong, Delgado contends that the alleged threats occurred two weeks after he filed his inmate claim and four days after the claim was approved. Dkt. No. 22-3, at 5-7. Although it is unclear how defendant could have learned of Delgado's property claim (Dkt. No. 22-1, at 65-66; Dkt. No. 22-6, at 3), Delgado suggests that defendant was aware of the claim because defendant directly referred to said claim when he made his threats. Compl. at 4-5. Thus, there appears to sufficient evidence of a causal connection between the protected act, filing an inmate claim, and the alleged adverse action, defendant's threats.

Accordingly, it is recommended that defendant's motion for summary judgment be denied on this ground.


D. **Fourteenth Amendment Equal Protection**

Delgado alleges that defendant denied him Equal Protection of the laws under the Fourteenth Amendment of the Constitution because he was treated differently from inmates who had not filed personal property claims. Compl. at 6, 8.

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated persons alike. <u>Giano v. Senkowski</u>, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing <u>Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439

19

(1985)).  To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class.  See Senkowski, 54 F.3d at 1057 (citing, inter alia, McCleskey v. Kemp, 481 U.S. 279, 292 (1987)).  The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) quoting Shaw v. Murphy, 532 U.S. 223, 225 (2001) (internal quotation marks omitted)).

Delgado claims that he was denied equal protection because he was treated differently than inmates who had not filed inmate claims.  Delgado explained that his disparate treatment is that he has been "getting violated . . . getting bothered . . . .  you know you're his target and he just likes to mess with you."  Dkt. No. 22-1, at 67-68.  Even reading Delgado's submissions liberally, the only disparate treatment alleged is that the complaining inmates would have their lockers pushed over and would be threatened to be beaten or set up with false misbehavior reports should they file grievances, whereas noncomplaining inmates would not face such treatment.  Id.  However, Delgado's submissions suggest that he was subject to such treatment before he submitted the inmate claim form.  He alleged that defendant pushed over his locker on at least two occasions prior to filing the inmate claim on June 4, 2013.  Id. at 17.  Indeed, Delgado had never filed an inmate claim or grievance prior to the June 2013 inmate claim.  Id. at 23.  Delgado testified that the two earlier instances of defendant pushing over his locker related to either his or his bunkmate's locker being out of compliance – not because of his exercise of protected speech.  Id. at 16-

20

17.  Moreover, Delgado alleged that he, along with the rest of his dorm, faced threats before ever filing his inmate claim.  Delgado testified that defendant made general threats to all of the inmates in his dorm informing them that the "consequences" of filing grievances would include being beaten up or being "set up" with false misbehavior reports.  Id. at 23-24. Thus, Delgado has failed to demonstrate that inmates who filed grievances or claims were treated differently from those who do not, as Delgado was subject to the same disparate treatment – threats and his locker being pushed over – before he filed his property claim, as were all inmates in his dorm.

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

## IV.  **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that

(1) defendant's motion for summary judgment be **GRANTED**  as to the Fourteenth Amendment Equal Protection claim; and

(2) defendant's motion for summary judgment be **DENIED** as to the First Amendment claim and the exhaustion defense.

Pursuant to 28 U.S.C. § 636 (b) (1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636 (b) (1) (B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993);

21

<u>Small v. Sec'y of Heath and Human Servs.</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72, 6 (a), 6 (e).


Date: December 19, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge